UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

EMMANUEL BARNES,

        Plaintiff,

        v.

GENERAL MOTORS LLC
f/k/a GENERAL MOTORS CO.,

        Defendant.

Case No. 4:20-cv-00087-TWP-DML

## DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### I.      INTRODUCTION

In early 2019, Defendant, General Motors LLC ("Defendant" or "GM") learned third shift Crib Attendant Plaintiff Emmanuel Barnes ("Plaintiff" or "Barnes") had been avoiding driving a forklift for years through an unsanctioned arrangement with a co-worker. When GM informed Plaintiff he needed to drive a forklift to keep his position, Plaintiff cited a neck injury and demanded that he be allowed to stay in his role and <u>not</u> drive a forklift. GM attempted to engage in an interactive process with Plaintiff, provided paid medical leave, and ultimately offered him a position he could perform within his restrictions. While Plaintiff alleges that GM discriminated and retaliated against him because of his disability in violation of the ADA and the ADEA, the undisputed material facts mandate summary judgment in favor of GM. Those undisputed facts demonstrate Plaintiff refused to meaningfully participate in the interactive process with GM after it became clear Plaintiff could not perform the essential job duties of a Crib Attendant, instead demanding an accommodation that was wholly unreasonable: that he be allowed to continue avoiding an essential function of his job. He refused to participate in the workplace accommodation program jointly established by GM and his union – and erroneously seemed to

regard the program as being punitive in nature, when it actually may have provided more options for accommodations – and failed to report to work when GM found him a job within his restrictions.   Moreover, he cannot identify any similarly-situated non-disabled or younger employees who were treated more favorably, nor can he establish any causal connection between his age, purported disability, or any protected activity, and the purported adverse employment actions.   For the reasons set forth herein, GM respectfully requests this Court grant summary judgment in its favor on all claims.

## II.  STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

GM's Statement of Material Facts sets forth the facts in the light most favorable to Plaintiff, as required by Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56-1.  GM reserves, and does not waive, its right to contest such facts at trial.

**A.**   **Plaintiff's Employment at GM**

1.   Plaintiff began working for GM in December 1978 at GM's aluminum die casting plant in Bedford, Indiana.  (Deposition of Emmanuel Barnes ("Pl. Dep.") 15:15-16:3).   The Bedford plant manufactures transmission castings, housing and torque converters, engine heads, floor bearings, and high integrity die cast structural components.  (Deposition of Mary Pacheco ("Pacheco Dep."), 10:19-24).

2.   Plaintiff was a member of the United Auto Workers ("UAW") union, Local 440, throughout his employment.  (Pl. Dep., 16:4-16).  The National Agreement between the UAW and GM governed the terms of Plaintiff's (and all bargaining unit members') employment.  (Pl. Dep., 30:12-23).

**B.**   **The Crib Attendant Position**

3.   GM's Indirect Material Department at Bedford (commonly and interchangeably

referred to as the "crib") houses spare parts that are used for manufacturing equipment operating in the facility.  (Deposition of Sylvia Brown ("Brown Dep."), 8:2-5, 17:20-20:25; Deposition of Todd Smith ("Smith Dep."), 21:13-20, 25:11-18; Deposition of Todd Harhay ("Harhay Dep."), 10:10-24).

4.      The job duties of a Crib Attendant included (but were not limited to) maintaining the supply of parts in the crib, stocking parts, performing inventory counts, manning a walk-up window in the crib, and operating a burden carrier and a fork truck to move and deliver parts, unload material from deliveries, and remove items from industrial shelving.  (Brown Dep., 17:20-20:25; Pacheco Dep., 97:15-23, 100:9-14; Smith Dep., 59:14-17; Declaration of Larry Butler ("Butler Decl."), ¶ 8; Declaration of Mary Pacheco ("Pacheco Decl.), ¶ 7 and Ex. 1).

5.      More specifically, the Crib Attendant role required fork truck driving because "[a]t any shift they [may need to] get a large piece of equipment off a truck …, may have to deliver chemicals to the line, may have to deliver a motor to the line, which … could be on a shelf, a high shelf, so in order to deliver it to the line they would have to drive a fork truck."  (Harhay Dep., 80:18-81:13).  It is "one of the items that you have to be able to do to be a crib attendant," and "[a]ll Crib Attendants do the same job."  (Brown Dep., 44:22-45:3; Harhay Dep., 86:20-21).  There are not "different separate roles when it comes to Crib Attendant."  (Harhay Dep., 87:18-20).

6.      In 2019, Plaintiff held the position of third shift Crib Attendant, and reported to Indirect Material Lead Sylvia Brown.  (Pl. Dep., 16:17-19:9; Brown Dep., 7:14-21).

7.      Third shift was the overnight shift, and Plaintiff typically had a start time of 11:00 p.m. and a stop time of 7:30 a.m. (outside of any overtime worked).  (Pl. Dep., 17:12-18:5).

8.      Brown typically was not physically present during most of third shift; she was usually in the plant from 5:00 or 5:30 a.m. to 4:00 or 5:30 p.m., and saw Plaintiff on a "sporadic"

basis.  (Brown Dep., 9:14-21, 31:8-12).  Neither was Global Supply Chain ("GSC") Director Todd Smith, who was typically present during first shift hours, and therefore did not observe how work was being done on third shift in the crib.  (Smith Dep., 31:9-12, 44:3-11).

9.      At the time Plaintiff worked as a third shift Crib Attendant, there were typically five Crib Attendants on first shift (approximately 7:00 a.m. to 3:00 p.m.), two on second shift (approximately 3:00 p.m. to 11:00 p.m.), and two on third shift.  (Pl. Dep., 21:2-8; Smith Dep., 31:2-6).

10.     Besides Plaintiff, the other third shift Crib Attendant was Larry Butler.  Butler primarily worked in the main crib, and Plaintiff primarily worked in the tool room crib.  (Pl. Dep., 22:18-25, 26:25-28:15; Butler Decl., ¶ 7).  Butler had more seniority than Plaintiff.  (Pl. Dep., 98:19-21; Butler Decl., ¶¶ 4, 14).

11.     During the years Plaintiff and Butler worked together as third shift Crib Attendants, Plaintiff did not and would not drive a fork truck.  (Pl. Dep., 33:18-22).  Butler did all of the fork truck driving, and Plaintiff did none.  (Smith Dep., 59:14-60:5; Butler Decl., ¶¶ 8, 10).  This was an unspoken understanding between Plaintiff and Butler; they did not discuss this arrangement with management or Human Resources/Labor Relations.  (Smith Dep., 59:14-60:5; Butler Decl., ¶ 12).

12.     When Smith started working at the Bedford plant around 2013 or 2014, he was told Plaintiff could not drive a fork truck, and inquired with both the union and plant Labor Relations about "what was going on."  (Smith Dep., 65:2-19, 71:2-21).  A former labor relations leader told Smith "that there was some sort of an understanding that [Plaintiff] wasn't going to drive a fork truck," and to "leave it alone."  (Smith Dep., 71:2-21).  Smith was not aware of any medical issues that prevented Plaintiff from driving a fork truck. (Declaration of Todd Smith ("Smith Decl."), ¶

6).

13.     Around the fall of 2018, the Indirect Material Group, in an initiative to gain efficiencies and standardize processes company-wide, began reporting to Global Business Solutions ("GBS") at the corporate level, as opposed to GSC at the plant level.  (Smith Dep., 17:1-18:1; Brown Dep., 13:22-11; Harhay Dep., 14:17-22).

14.     As a result, at that time, Brown, as a salaried Indirect Materials Lead, began reporting to Todd Harhay, who was an Indirect Materials Operations Manager with GBS in the Detroit area.  (Brown Dep., 10:12-16; Harhay Dep., 8:23-9:6, 15:10-17).  Prior to that time, Brown reported to Smith at the plant level in Bedford.  (Smith Dep., 22:9-24).  Harhay was based in the Detroit area, had responsibilities for indirect materials at all plants within Indiana, Ohio, and Texas, and came to Bedford periodically.  (Harhay Dep., 9:15-22, 12:19-13:1, 28:9-29:18).  In 2019, he spent approximately 20% of his time in Bedford.  (Harhay Dep., 40:15-17).

15.     The Crib Attendants in Bedford reported to Brown at all relevant times, both before and after the aforementioned transition, and were plant (not corporate) employees.  (Harhay Dep., 23:5-24:4).  The Crib Attendants could also take direction from Smith.  (Harhay Dep., 25:4-17).

16.     In 2019, Smith and Brown discussed the potential move of one of the two third shift Crib Attendants to first shift, in order to help with an increased amount of work on first shift due to a product launch.  (Smith Dep., 29:21-30:23).  Brown told Smith she believed that third shift was where the department could go down to one Crib Attendant the easiest, and Smith agreed. (Smith Dep., 39:6-16; Smith Decl., ¶¶ 7-8).

17.     Because Butler had more seniority, he chose to remain on third shift. (Butler Decl., ¶¶ 13-14).  As a result, Plaintiff was going to have to move to first shift.  (Smith Dep., 40:3-41:5; Butler Decl., ¶ 14).  The first shift Crib Attendant position was "much more fork truck intensive."

(Smith Dep., 71:17-73:8).

## C.    Plaintiff's Restrictions

18.    Plaintiff describes his "disability" as: "I can't turn my head and look backwards because it will – at certain times when I do it, it will send me into spasms and I can't function.  I have like little seizures, my chest seizes up."  (Pl. Dep., 135:5-15).

19.    Around March 2019, Brown advised Plaintiff that his fellow hourly employees were complaining that he never drove the fork truck.  (Pl. Dep., 40:5-20).

20.    Plaintiff  "never had a fork truck driver's license."  (Pl. Dep., 38:15-17).

21.    Plaintiff informed Brown he had a restriction on file with the plant medical department pursuant to which he could not operate a fork truck.  (Pl. Dep., 40:5-10).  This was the first occasion on which Plaintiff spoke with Brown about his medical restriction.  (Pl. Dep., 41:17-23).  Brown checked with the plant medical department, which advised that Plaintiff did not have an active restriction on file.  (Deposition of Tiffany Grogan ("Grogan Dep."), 27:4-22).  Brown advised Plaintiff accordingly, and Plaintiff subsequently brought a copy of a restriction dating back to 2004 or 2005 into plant medical.  (Pl. Dep., 43:8-15; Grogan Dep., 27:4-11; Deposition of Pam Troutman ("Troutman Dep."), 36:14-22).

22.    While Plaintiff had a restriction several years prior pursuant to which he was not to operate motorized vehicles in the workplace, plant medical lifted that restriction on September 7, 2006.  (Pl. Dep., 159:16-161:11; Declaration of Tiffany Grogan ("Grogan Decl."),  ¶ 3 and Ex. 1).

23.    In the meantime, Brown informed Harhay that they "had a person who should not be driving any mobile equipment due to [the fact that he] didn't have a [plant] driver's license." (Harhay Dep., 43:17-4).

24.    Plaintiff was informed that the plant medical doctor had to approve any restrictions,

and his department made an appointment for him for that purpose.  (Pl. Dep., 53:7-15).

25.    Brown informed Smith and Harhay:  "Emmanuel Barnes has seen his family doctor for an updated restriction, scheduled to see our company doctor on Monday at 6:30 A.M.  Will let you know the outcome and plan to pursue his ineligibility to perform the Crib Attendant job if he has a driving restriction."  (Harhay Dep., 51:16-52:1; Smith Decl., ¶ 9 and Ex. 1).

26.    On April 8, 2019, Plaintiff saw the plant medical doctor, who issued a temporary restriction of "no operating power equipment," set to expire on April 6, 2020, and referred Plaintiff to the ADAPT program.  (Pl. Dep., 54:7-56:13; Grogan Decl., ¶ 4 and Ex. 2).  This temporary restriction prevented Plaintiff from driving either a fork truck or a burden carrier.  (Pl. Dep., 98:22-99:1).  Plaintiff testified it was "impossible for [him] to do [his] job" if he could not drive the burden carrier.  (Pl. Dep., 89:13-16).

**D.    ADAPT, Plaintiff's Refusal to Participate, and His Subsequent Medical Leave**

27.    GM and the UAW created and administered a workplace accommodation program entitled "Accommodating Disabled People In Transition," or "ADAPT."  (Pacheco Decl., ¶ 8 and Ex. 2).  The purpose of ADAPT was to enable employees with disabilities to be considered for opportunities to be retained at work or return to work from a sick leave or worker's compensation leave and be placed on jobs within their physical restrictions.  (Pl. Dep., 30:24-31:9; Deposition of Kevin Beasley ("Beasley Dep."), 17:13-20:15, Pacheco Decl., ¶ 8 and Ex. 2).

28.    ADAPT is a voluntary program for employees returning to work following an illness, injury, or disability.  (Deposition of Joyce Combs ("Combs Dep."), 32:14-19).  When an employee returns to work with restrictions, plant medical evaluates the employee, issues a duty disposition letter ("DDL") describing the restrictions which prevent the employee from doing his or her job duties, and refers the employee to ADAPT.  (Beasley Dep., 8:1-21; Pacheco Dep., 78:19-

79:25; Combs Dep., 31:18-33:11).   If the employee elects to participate, the ADAPT representatives decide whether the employee can be placed into a job within his or her restrictions, or whether there is no job within his or her restrictions.  (Beasley Dep., 8:1-21; Pacheco Dep., 78:19-79:25; Combs Dep., 31:18-33:11).

29.     In approximately April 2019, Joyce Combs took over as the GM management representative for the ADAPT program in Bedford.  (Combs Dep., 30:14-21, 51:5-52:7).  Kevin Beasley served as the UAW representative for the ADAPT program from approximately 2004 to the present.  (Pl. Dep., 31:22-23, 56:18-57:19; Beasley Dep., 12:6-9, 43:24-44:13).

30.     Plaintiff spoke with Beasley following his April 8, 2019 visit to plant medical.  (Pl. Dep., 56:18-22).  Plaintiff did not meet with Combs, nor did Beasley invite her to discuss Plaintiff's ADAPT status.   (Beasley Dep., 21:4-10, 24:10-15, 50:2-18, 82:23-83:18; Combs Dep., 45:17-46:12, 54:12-25).  Beasley told Plaintiff that, if he took ADAPT, he would "be going back to [his] same job on day shift doing the same thing, but not having a shift preference and not being allowed to have overtime." (Pl. Dep., 57:3-8).   Beasley also told Plaintiff that ADAPT was only a 90-day program; Plaintiff told Beasley his restriction was permanent, which Beasley said he knew.  (Pl. Dep., 60:7-61:18).  Beasley deemed Plaintiff not to be eligible for ADAPT, because he believed ADAPT was "not for permanent injuries," and he in fact told Plaintiff he "wasn't qualified for the ADAPT program."  (Beasley Dep., 67:6-10; Pl. Dep., 93:12-14).  The ADAPT program does, however, cover permanent injuries, allowing employees to be retained at work or returned to work from Sickness and Accident or Workers' Compensation Leave and be placed on jobs in line with the Local and National Agreements and their physical restrictions.  (Pacheco Decl., ¶ 8 and Ex. 2).  After consulting with Beasley, Plaintiff declined participation in the ADAPT program.  (Pl. Dep., 56:18-57:19; Beasley Dep., 43:24-44:13).

8

31.     Plaintiff's restriction was of particular concern at that point, because of his impending move to first shift, where the Crib Attendant position had become "a much more fork truck intensive position" due to plant operations at that time.  (Smith Dep., 71:17-73:8).

32.     Around April 2019, Smith "had reviewed classifications and [determined] you can either do all of the classification, or none of the classification."  (Beasley Dep., 50:2-18; Smith Decl., ¶ 10).

33.     Harhay too "wanted to make sure that each Crib Attendant could do all the [job] functions." (Brown Dep., 31:13-33:9, 39:14-21).

34.     No crib attendant other than Plaintiff had restrictions that prevented them from driving a fork truck.  (Brown Dep., 46:7-10; Grogan Decl., ¶ 5).

35.     As Brown stated in an April 8, 2019 email to Harhay, Smith, and Kelsey Carmichael in Human Resources/Labor Relations, Plaintiff was "unable to drive [which was] a requirement for the crib attendant function."  (Smith Decl., ¶ 11 and Ex. 2).

36.     ADAPT may have provided the possibility for Plaintiff to be retained at work in the crib in some capacity, but because Plaintiff declined to participate in the program, he was placed on a 30-day medical leave by plant medical.  (Pl. Dep., 57:20-58:17; Smith Decl., ¶ 11 and Ex. 2; Pacheco Decl., ¶ 8 and Ex. 2).  Plaintiff received pay for his medical leave through GM's short-term disability benefit program. (Pacheco Decl., ¶ 9).

37.     Plaintiff returned to plant medical on May 13, 2019 for a follow-up appointment. (Pl. Dep., 68:2-70:7).  Plant medical issued an alternative temporary restriction of "limited driving, no driving forklift, may drive burden carrier."  (Pl. Dep., 68:2-70:7; Beasley Dep., 57:3-58:15; Grogan Dep., 32:17-33:1; Grogan Decl., ¶ 6 and Ex. 3).

38.     Plaintiff spoke with Beasley again, once again without involving Combs.

(Declaration of Joyce Combs ("Combs Decl."), ¶ 14).  Beasley spoke with Todd Smith, who confirmed there were "no exceptions" and fork truck driving was required to work in the Crib Attendant position, because the position required the ability to drive a fork truck to unload trucks and get material from the higher shelves.  (Pl. Dep., 70:12-72:19; Smith Dep., 77:17-80:9; Harhay Dep., 59:3-61:6; Smith Decl., ¶ 12 and Ex. 3).

39.     Smith advised Site Human Resources/Labor Relations Director Mary Pacheco, Brown, and Harhay of his concerns that they had been "walking a fine line" with Plaintiff, because Plaintiff "ha[d] been allowed to work in a position that he is not qualified to perform" due to his inability to drive a fork truck.  (Harhay Dep., 64:16-65:2; Smith Decl., ¶ 13 and Ex. 4).  Plaintiff elected to remain on medical leave at that time.  (Pl. Dep., 71:23-72:24).  Beasley told him to "go enjoy his summer."  (Pl. Dep., 72:3-7).

40.     Plaintiff returned to plant medical on August 5, 2019, at which time the plant doctor renewed his restriction through November 4, 2019, and instructed him again not to turn down the ADAPT program.  (Pl. Dep., 76:17-77:10).

41.     Plaintiff consulted with Beasley again without Combs, and then returned to plant medical, accompanied by a union representative, because he wanted a permanent restriction put in place.  (Pl. Dep., 78:17-81:23).   The plant medical doctor "printed up another paper" and instructed Plaintiff to take it to his supervisor and "report back to work".  (Pl. Dep., 78:7-81:23; Combs Dep., 70:7-22).

42.     On August 19, 2019, plant medical made Plaintiff's "no forklift driving" restriction permanent, and referred Plaintiff to Human Resources/Labor Relations for job placement.  (Pl. Dep., 94:24-95:23; Grogan Dep., 72:25-73:9; Grogan Decl., ¶ 7 and Ex. 4).

43.     Plaintiff reported to work in the crib later that night.  (Pl. Dep., 81:24-83:23).

44.     Indeed, Plaintiff ended up working third shift in the crib (unbeknownst to management until after the fact) overnight from August 19-20, 2019.  (Smith Decl., ¶ 14 and Ex. 5).

**E.     Plaintiff Attempts to Circumvent Management and Return to Work in the Crib**

45.     On August 20, 2019, Brown emailed Carmichael in Human Resources/Labor Relations, inquiring "[h]ow do I transfer [Plaintiff] to Production?  With his restriction (unable to drive a fork truck), he is unable to perform the crib attendant position."  (Smith Decl., ¶ 15 and Ex. 6).  Smith, who was copied on the email, responded "[h]e cannot be on an off-shift and he cannot go back to his job.  If he wants to come back on ADAPT he can go work in production."  (Smith Decl., ¶ 15 and Ex. 6).

46.     On August 21, 2019, Brown instructed Plaintiff to see Smith.  (Pl. Dep., 86:1-8). Smith advised Plaintiff he should be in the ADAPT program, and Plaintiff said that was incorrect. (Pl. Dep., 86:7-20).

47.     Plaintiff, Smith, and the union committeeman met with Pacheco and Combs in Human Resources/Labor Relations, where Pacheco instructed Plaintiff to continue to report to work on third shift unless he heard otherwise, because employees were not permitted to change shifts in the middle of a week.  (Pl. Dep., 87:9-88:18; Combs Dep., 64:14-22, 74:24-75:4).

48.     Plaintiff reported to work in the crib on third shift the next two nights.  (Pl. Dep., 88:21-90:19).  Brown instructed Plaintiff not to drive the burden carrier, and to stay in the main crib with Butler.  (Pl. Dep., 89:8-91:7).  Brown had Plaintiff perform projects such as counting parts and re-labeling, which were jobs that an employee in the ADAPT program might be able to perform on a temporary basis, but not jobs that a Crib Attendant could perform on an indefinite basis.  (Smith Decl., ¶ 16 and Ex. 7).

49.     In the meantime, Brown, Smith, Combs, and Pacheco held a meeting, at which a consensus was reached that all Crib Attendants had to drive fork trucks, and management was unable to accommodate Plaintiff's restriction.  (Combs Dep., 76:16-77:12; Smith Dep., 91:15-93:24). At the end of his shift on August 23, 2019, Brown instructed Plaintiff there was no job available for him, and he was to contact HR.  (Pl. Dep., 91:12-94:17).

50.     Plaintiff's union filed two grievances on his behalf at that time, on August 20 and 24, 2019, respectively, in relation to Plaintiff's medical restrictions and his being "sent … out on sick leave unjustly," and management discriminating against Plaintiff because of his medical restrictions by informing him "not to report to work."  (Pl. Dep., 97:6-100:2, and Ex. 9 thereto). Neither of these grievances mentioned anything about Plaintiff's age, or any age discrimination. (Pl. Dep., 139:2-10).

**F.     GM Instructs Plaintiff to Report to Work in Die Cast North**

51.     Human Resources/Labor Relations looked for a position for Plaintiff that met his restrictions and satisfied the requirements of the National Agreement for a transfer.  (Combs Dep., 80:19-83:23; Pacheco Dep., 122:20-124:21).

52.     The only area of the plant that does not require usage of forklifts is Die Cast North. (Beasley Dep., 47:3-16; Combs Dep., 80:23-81:13).

53.     On September 5, 2019, Combs called Plaintiff to advise GM had identified a position for him within his restrictions in Die Cast North, and he would need to report to work on second shift in Die Cast North the following day.  (Pl. Dep., 111:4-17; Combs Dep., 86:19-88:16).

54.     Plaintiff understood he would not be able to return to his Crib Attendant position on third shift.  (Pl. Dep., 114:4-9).  But Plaintiff responded that he needed to talk to his union, because he believed he should be moved into a different position than that particular position (i.e.,

alloy melter in box A, not Die Cast North on second shift) according to the Local 440's agreement with GM.  (Pl. Dep., 111:19-25, 113:7-17, 124:4-15).  Combs told him he needed to report to work as instructed, and sent him a letter instructing him to report to work on September 6, 2019 on second shift in Die Cast North.  (Combs Dep., 88:7-21; Pacheco Decl., ¶ 10 and Ex. 3).  Plaintiff admittedly received the letter on September 6, 2019, but nevertheless failed to report to work as instructed.  (Pl. Dep., 112:15-21; Combs Dep., 92:19-93:3)

55.    Plaintiff admits the Die Cast North position would not have required him to drive a fork truck.  (Pl. Dep., 135:1-4).

56.    When Plaintiff did not report to his September 6, 2019 shift as instructed, Combs solicited Pacheco's advice.  (Combs Dep., 93:7-94:25).  Pacheco advised to give Plaintiff three days to show up, "then send him a 64 letter," referencing Paragraph (d) of the National Agreement. (Pacheco Dep., 111:20-112:10).

57.    Paragraph 64 of the National Agreement states, in relevant part, as follows:

Loss of Seniority

(64)    Seniority shall be broken for the following reasons:

***

(c)    If the employee is absent for three working days without properly notifying the Management, unless a satisfactory reason is given. …

(d)    If the employee fails to return to work within five working days after being notified to report for work, and does not give a satisfactory reason.  Such notice shall be clear in intent and purpose. …

(Pacheco Decl., at ¶ 12 and Ex. 4).

58.    Plaintiff purposely waited until September 12, 2019 to call GM's automated phone line to report he was using "vacation restricted" or "VR" days to cover his otherwise unexcused absences on September 6, 9, 10, 11, and 12, 2019.  (Pl. Dep., 118:2-121:19).  He did not call a

manager during that time period, and deliberately allowed the company to wonder where he was. (Pl. Dep., 121:20-25).  He reported on the automated line that he planned to return to work on October 1, 2019.  (Pl. Dep., 122:1-3).  He testified that he "took vacation so the union could straighten … out" the issues with regard to the new position to which he had been assigned.  (Pl. Dep., 122:15-18).  He believed he could retroactively use VR days for the shifts on September 6, 9, 10, and 11, 2019 for which he was a no-call, no-show.  (Pl. Dep.,123:7-12).

G.   **GM Terminates Plaintiff Due to His Failure to Report to Work or to Utilize Proper Call-Off Procedure**

59.   Combs determined that Plaintiff failed to report to work as he was instructed by communicating with Debby Hauer, Plaintiff's supervisor in Die Cast North.  (Combs Dep., 92:19-93:16).  She did not check to see whether he had called the automated phone line to use VR days, as "[t]hat would be up to the supervisor, and she would check that."  (Combs Dep., 104:24-105:23).  Even if she had known, her decision would have remained the same.  (Combs Decl., ¶ 20).

60.   The situation with Plaintiff "was kind of skirted to the side" for a short period, due to the pending expiration of the National Agreement between the UAW and GM, and looming strike.  (Combs Dep., 108:6-109:5).  The UAW went on strike on September 15, 2019.  (Pacheco Decl., ¶ 11).

61.   Combs ultimately sent a letter to Plaintiff dated September 26, 2019, advising his seniority was broken pursuant to the provisions of Paragraph 64(d) of the GM-UAW National Agreement, and he was terminated effective September 13, 2019.  (Pl. Dep., 115:22-116:11; Combs Dep., 96:24-97:7; Pacheco Decl., ¶ 13 and Ex. 5).

62.    Paragraph 64(d) is frequently utilized "where an employee has absented themselves without prior approval," and notice is provided to "instruct[ ] them that they need to return back to work."  (Deposition of Randall Gallinger ("Gallinger Dep."), 27:10-19, 28:5-9).

14

**H.     Plaintiff Identifies No Comparators, Nor Any Discriminatory or Retaliatory Comments**

63.     Plaintiff testified GM was "having all the new, younger people come in.  They're more computer savvy than us older people.  And they were at half pay, $16 an hour or something instead of 30.  If you get rid of the older staff, you can have two for one."  (Pl. Dep., 134:13-21).

64.     Plaintiff, however, admits that no one at GM ever said anything negative to him about his age.  (Pl. Dep., 144:15-17).

65.     Moreover, people older than Plaintiff continued to work in the crib after Plaintiff was terminated, including Butler, who continued to work in the crib on third shift.  (Pl. Dep., 150:13-16; Pacheco Decl., ¶¶ 14-15).

66.     Plaintiff further testified Melissa Tincher "doesn't drive" a fork truck "because she can't see," but "has no restrictions saying not to."  (Pl. Dep., 108:12-20).  However, Tincher (year of birth: 1966) was indeed able to work on the fork truck when needed, and had no restriction on file with plant medical prohibiting her from doing so.  (Pacheco Decl., ¶ 16; Smith Decl., ¶ 17; Grogan Decl., ¶ 5).

67.     The only negative comments made to Plaintiff about his medical restrictions were by his co-workers, who "were bitching about [him] not driving."[1]  (Pl. Dep., 144:18-23).

68.     In addition to Plaintiff, there were six other Bedford employees terminated in 2018 and 2019 pursuant to Paragraph 64(d) of the National Agreement – Denny Ray Andis (year of birth: 1968), Marcus Anthony Horvath (year of birth: 1982), Judy Ann Johnson (year of birth: 1969), Justin Robert Jordan (year of birth: 1995), DeMarcio Dresean Morrow (year of birth: 1995), and Sammy Tarlton (year of birth: 1977).  (Pacheco Decl., ¶ 17).  None of the aforementioned

---

[1]     While Plaintiff testified that a foreman "tried to fire [him] for [his] restrictions" in 2010, he admitted that he did not report to either Brown or Smith at that time, nor were Pacheco or Combs involved.  (Pl. Dep., 145:1-22).

employees had an active DDL at the time of their respective terminations.  (Grogan Decl., ¶ 8).

All are younger than Plaintiff.  (Pacheco Decl., ¶ 17).

69.     Plaintiff filed his original Charge of Discrimination with the EEOC on October 25,

2019 – several weeks after his termination.  (Pl. Dep., 139:18-140:5, and Ex. 16 thereto).

70.     While Plaintiff testified that he told "[a]nybody that would listen" that he had been

talking to the EEOC, he does not recall telling anyone in GM management or Human

Resources/Labor Relations prior to his termination that he had contacted the EEOC, and Plaintiff

testified he "can't prove one way or the other" whether GM knew he had consulted with the EEOC

when they terminated him.  (Pl. Dep., 141:8-142:9, 150:7-12).

71.     Smith, Pacheco, Harhay, Carmichael, and Combs had no knowledge of Plaintiff

"talking" to the EEOC prior to his termination.  (Smith Decl., ¶ 18; Pacheco Decl., ¶ 19; Combs

Decl., ¶ 21; Declaration of Todd Harhay ("Harhay Decl."), ¶ 6; Declaration of Kelsey Carmichael

("Carmichael Decl."), ¶ 8).

## III.     SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the "pleadings, depositions, answers to interrogatories and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R.

Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 247 (1986).  In ruling on a motion for summary judgment, the court "view(s) the

record in the light most favorable to the non-moving party and draw(s) all reasonable inferences

in that party's favor."  *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009).  Nevertheless, the

courts' favor toward the non-moving party does not extend to drawing "inferences that are

supported only by speculation or conjecture."  *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir.

2010) (internal quotations omitted).  "A party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial."  *Spierer v. Rossman*, Case No. 1:13- cv-00991-TWP-TAB, 2014 U.S. Dist. LEXIS 138939, *4 (S.D. Ind. Sept. 30, 2014).  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial," Rule 56(c) mandates the entry of summary judgment against a party. *Celotex*, 577 U.S. at 322.

## IV.    ARGUMENT

A.    **Plaintiff's Disability Discrimination Claim Fails as a Matter of Law**

The "legal standard [in discrimination cases] is . . . whether the evidence would permit a reasonable factfinder to conclude that the [Plaintiff's purported disability] caused the discharge or other adverse employment action."  *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).  *Ortiz* dispensed with the old "direct- and indirect-framework" as it relates to the "proposition that evidence must be sorted into different piles, labeled 'direct' and 'indirect.' " 834 F.3d at 766.  However, the Seventh Circuit has not entirely done away with separate tests or methods to analyze discrimination cases, and it has stated that "the well-known and oft-used *McDonnell Douglas* framework for evaluating discrimination remains an efficient way to organize, present, and assess evidence in discrimination cases."  *Hash v. City of Greensburg*, No. 119-CV-01157-JMS-TAB, 2020 WL 5798205, at *10 (S.D. Ind. Sept. 29, 2020); *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019); *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018).

Plaintiff may prove disability discrimination by using the holistic *Ortiz* approach, or the *McDonnell Douglas* burden-shifting method.  *Ortiz*, 834 F.3d at 756; *Deluca v. Winer Indus.*, 53

F.3d 793, 797 (7th Cir. 1997).  To prevail under the *McDonnell Douglas* framework, Plaintiff must prove a *prima facie* case that: (1) he is disabled under the ADA; (2) he was meeting GM's legitimate expectations; (3) he suffered from an adverse employment action; and (4) similarly-situated non-disabled employees were treated more favorably.  *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 601 (7th Cir. 2009).  If Plaintiff establishes a *prima facie* claim, the burden shifts to GM to produce a legitimate, non-discriminatory reason for his discharge.  *Dvorak v. Mostardi Platt Assocs*, 289 F.3d 479, 485 (7th Cir. 2002); *Hash*, 2020 WL 5798205, at *11.  If GM meets this burden, Plaintiff must then prove that the reasons proffered were pretext for disability discrimination.  *Id.*

Irrespective of which framework he uses, Plaintiff must additionally prove that his disability was the "but-for" cause of his termination; mixed motive is insufficient. *Castetter v. Dolgencorp, LLC*, 953 F.3d 994, 996 (7th Cir. 2020); *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019).  In other words, Plaintiff must prove that he was terminated because of his disability – not merely that his disability contributed to the decision.  *See Gross v. FBL Fin. Servs. Inc.*, 557 U.S. 167, 177 (2009).

1.   <u>As a Threshold Matter, Plaintiff Was Not Qualified to Perform the Essential Functions of His Position Either With or Without Reasonable Accommodation</u>

The ADA prohibits an employer from discriminating against a "qualified individual on the basis of disability."[2] 42 U.S.C. § 12112(a).  As a threshold matter, then, to be entitled to the ADA's protections, a plaintiff must be a "qualified individual" under the statute at the time the adverse employment action was taken.  *See Bilinsky v. American Airlines, Inc.*, 928 F.3d 565, 569 (7th Cir. 2019); *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 818 (7th Cir. 2004).  The ADA defines

---

[2]     As stated above, to prevail under the *McDonnell Douglas* framework, Plaintiff must prove that he is disabled under the ADA.  GM does not waive this issue, but it will not address it for summary judgment purposes.

a "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).  "When defining a job's essential functions, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description ... for the job, this description shall be considered evidence of the essential functions of the job.  Although we look to see if the employer actually requires all employees in a particular position to perform the allegedly essential functions, we do not otherwise second-guess the employer's judgment in describing the essential requirements for the job." *Bilinsky*, 928 F.3d at 569–70 (internal citations omitted).

The Seventh Circuit has long held that "a fired (demoted, etc.) worker who cannot do the job even with a reasonable accommodation has no claim under the Americans with Disabilities Act." *Matthews v. Commonwealth Edison Co.*, 128 F.3d 1194, 1195 (7th Cir. 1997) (citations omitted).  The Court has repeatedly held that "[t]o have another employee perform a position's essential function, and to a certain extent perform the job for the employee, is not a reasonable accommodation." *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 289-90 (7th Cir. 2015); *see also Gratzl v. Office of the Chief Judges of the 12th, 18th, 19th, & 22nd Judicial Circuits*, 601 F.3d 674, 680 (7th Cir. 2010) ("An employer need not create a new job or strip a current job of its principal duties to accommodate a disabled employee").

Here, it is undisputed that between September 2006 and April 2019, Plaintiff did not have a valid restriction on file with plant medical preventing him from driving a fork truck, and that any arrangement he had with his third shift counterpart not to drive a fork truck was an informal one that was not formalized with management.  (Pl. Dep., 54:7-56:13, 159:16-161:11; Butler Decl., ¶¶ 8-12; Grogan Decl., ¶¶ 3-4 and Ex. 1 and 2).  As Smith stated, Plaintiff "ha[d] been allowed to

work in a position that he is not qualified to perform."  (Harhay Dep., 64:16-65:2; Smith Decl., ¶ 13 and Ex. 4).  Plaintiff was able to stay "under the radar" until changes were needed in the crib. It is further undisputed that Plaintiff's refusal to drive (and eventual restriction preventing him from driving) a fork truck led to his co-worker(s) being required to cover some of his job duties; indeed Plaintiff's co-workers complained that he never drove the fork truck.  (Smith Dep., 59:14-60:5, 64:2-5; Butler Decl., ¶¶ 8-12; Pl. Dep.,40:5-20).  The Seventh Circuit has repeatedly held this sort of accommodation, in which another employee "perform[s] the job for the employee," or where a current job is stripped of its principal duties, is not reasonable.  *Stern*, 788 F.3d at 289-90; *Gratzl*, 601 F.3d at 680.  While Plaintiff disputes that fork truck driving was not a principal duty for <u>him</u> as a third shift Crib Attendant, it is undisputed that Plaintiff knew he would not be returning to third shift.  (Pl. Dep., 114:4-9).  In any event, GM, not Plaintiff, is entitled to determine the essential requirements for the job.  *Bilinsky*, 928 F.3d at 569–70.

Plaintiff therefore has no claim under the ADA.

2.   <u>Plaintiff Lacks Evidence of Any Adverse Action Taken "Because of" His Disability</u>

Plaintiff lacks evidence of causation between his alleged disability and any adverse employment action.  Again, the "legal standard [in discrimination cases] is . . . whether the evidence would permit a reasonable factfinder to conclude that the [plaintiff's purported disability] ***caused the discharge or other adverse employment action.***"  *Ortiz*, 834 F.3d at 765 (emphasis added).  Here, the evidence does not support any such conclusion.

a.   *Plaintiff's Removal From the Crib Attendant Position Was Not Discriminatory*

Plaintiff claims that GM discriminatorily removed him from his Crib Attendant position and placed him on medical leave in April 2019.  (Doc. 40, p. 2).  However, GM did not remove

Plaintiff from his Crib Attendant position and place him on medical leave in April 2019 because of his alleged disability – it did so because his request to remain in that position with the accommodation of not operating a fork truck was unreasonable.  Moreover, GM provided Plaintiff with a reasonable accommodation in the form of participation in its ADAPT program – and it was <u>Plaintiff</u> who turned down ADAPT, in April, May, and August of 2019.  (Pl. Dep., 30:24-31:9, 57:20-58:17, 71:23-72:24, 86:1-87:4; Beasley Dep., 17:13-20:15; Combs Dep., 65:13-21; Pacheco Decl., ¶ 8 and Ex. 2; Smith Decl.,  ¶ 11 and Ex. 2).

b.      *Plaintiff's Termination Was Not Discriminatory*

Plaintiff further claims his September 13, 2019 termination was discriminatory.  (Doc. 40, p. 2).  It is undisputed that Plaintiff received the letter on September 6, 2019 instructing him to report to work in Die Cast North – a position that would not have required him to drive a fork truck – but nevertheless failed to report to work as instructed.  (Pl. Dep., 111:18-114:6, 124:4-15, 135:1-4; Combs Dep., 88:17-21, 90:6-92:2, 92:19-93:3; Pacheco Decl., ¶ 10 and Ex. 3).  It is further undisputed that Plaintiff purposely waited until September 12, 2019 to call GM's automated phone line to report he was using VR days to cover his otherwise unexcused absences on September 6, 9, 10, 11, and 12, 2019, did not call a manager during that time period, and deliberately allowed the company to wonder where he was.  (Pl. Dep., 118:2-123:12).  Finally, it is undisputed that Combs was not aware of, and did not consider, Plaintiff's attempted usage of VR days at the time of his termination.  (Combs Dep., 92:19-93:16, 104:24-105:23).  GM did not terminate Plaintiff because of his alleged disability, but because it honestly believed he failed to report to work in violation of Paragraph 64 of the National Agreement.

Plaintiff lacks evidence of any adverse action taken because of his disability, and his claim therefore fails.

3.     Plaintiff Fails to Identify Any Similarly-Situated, Non-Disabled Employees
       Treated More Favorably

Plaintiff's disability discrimination claim also fails because he has not identified any non-disabled employee who was "directly comparable … in all material respects" and treated more favorably. *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). For the similarly-situated inquiry, relevant factors include whether the employee performed the same job, reported to the same supervisor, was subject to the same standards, and possessed comparable qualifications. *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). Because the similarly-situated element ensures that an inference of unlawful intent is reasonable, "the comparators must be similar enough that any differences in their treatment cannot be attributed to other variables" including differing positions, performance, or supervisors. *Senske v. Sybase, Inc.*, 588 F.3d 501, 510 (7th Cir. 2009).

Plaintiff has not identified a single non-disabled comparator at any point in this litigation. GM, on the other hand, has identified six Bedford employees terminated in 2018 and 2019 pursuant to Paragraph 64(d) of the National Agreement who did not have active DDLs at the time of their respective terminations – Andis, Horvath, Johnson, Jordan, Morrow, and Tarlton. (Grogan Decl., ¶ 8).

Plaintiff simply cannot raise a triable issue that any non-disabled employee directly comparable to him in all material respects was treated more favorably than he was. His claim therefore fails at the *prima facie* case.

4.     GM Had Legitimate, Non-Discriminatory Reasons for Its Decisions Such
       That Plaintiff Cannot Prove That GM's Reasons for Its Decisions Were
       Pretextual in Nature

Even if Plaintiff could establish a prima facie case of discrimination, which he cannot, GM had legitimate, non-discriminatory reasons for its employment decisions with respect to Plaintiff.

"The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 983 (7th Cir. 1999); *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 732 (7th Cir. 2001) (for pretext, a plaintiff "must show more than that the employer's decision was incorrect; he must also show the employer lied about its proffered explanation"); *Benuzzi v. Board of Educ. of City of Chicago*, 647 F.3d 652, 663 (7th Cir. 2011) (to show pretext, an employee must come forward with evidence that at least raises the inference that the employer's offered reason is a "phony excuse" for discrimination).  Evidence giving rise to a material fact as to pretext must create a reasonable inference that "(1) it is more likely that a discriminatory reason motivated (the employer's) decision than the proffered non-discriminatory reason(s); or (2) that (the employer's) explanation is not credible." *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 737 (7th Cir. 2006).  To make this evidentiary showing, Plaintiff must produce "significantly probative admissible evidence from which the trier of fact could infer that the employer's reason was false." *Jones v. Union Pacific R.R. Co.*, 302 F.3d 735, 742 (7th Cir. 2002) (quoting *King v. Preferred Tech. Group*, 166 F.3d 887, 892-93 (7th Cir. 1999)).  In other words, "a party establishes pretext with evidence that the employer's stated reason or the employment decision 'was a lie—not just an error, oddity, or oversight.'" *Lauth v. Covance, Inc.*, 155 F. Supp. 3d 855, 880 (S.D. Ind. 2016) (citing *Teruggi v. CIT Grp./Capital Fin., Inc.*, 709 F.3d 654, 661 (7th Cir.2013)).  As stated in *Lauth*, "[w]hile [the plaintiff's] explanations may have eliminated any cause for concern in his eyes, it is [his employer's] assessment of his performance that matters. *Id.* at 880 (citations omitted).  "And, "this court does not sit as a super-personnel department that reexamines an entity's business decisions." *Id.* at 881.

Plaintiff cannot meet this burden here.

      a.    *GM's Reason for Removing Plaintiff From the Crib Attendant Position Is Not Suggestive of Pretext*

Plaintiff asserts in his Statement of Claims that "GM's stated reason that it could no longer permit Plaintiff to work as a crib attendant without driving a forklift because he had been transferred to first shift and because there was no work available on third shift is a pretextual fabrication designed to conceal GM's discriminatory motivation." (Doc. 40, at p. 2).   The evidentiary record in this case is replete with emails contemporaneous with GM's decisions regarding Plaintiff, which demonstrate that GM's proffered reason for removing Plaintiff from the Crib Attendant position was honest – not some false narrative cobbled together either then, or after the fact.   (Pl. Dep., 70:12-72:19; Smith Dep., 77:17-80:9; Harhay Dep., 51:16-52:1, 59:3-61:6; Smith Decl., ¶¶ 9, 11-12 and Ex. 1, 2, and 3).   In May 2019, Smith expressed his concerns to Pacheco, Brown, and Harhay that they had been "walking a fine line" with Plaintiff, because he "ha[d] been allowed to work in a position that he is not qualified to perform" due to his inability to drive a fork truck.   (Harhay Dep., 64:16-65:2; Smith Decl., ¶ 13 and Ex. 4).   While Plaintiff's performance of the Crib Attendant role for several years without driving a fork truck may have been overlooked, this was at most an oversight or mistake, and is not suggestive of any pretext. *Jackson*, 176 F.3d at 983; *Johnson*, 260 F.3d at 732.

>    b.    *GM's Reason for Terminating Plaintiff Is Not Suggestive of Pretext*

Addressing his termination, Plaintiff claims "Defendant's contention that Plaintiff's absence from work operate to terminate his employment is a pretextual fabrication designed to conceal its discrimination." (Doc. 40, p. 2).   Again, it is undisputed that Plaintiff knew he was required to report to work in Die Cast North – a position that would not have required him to drive a fork truck – but nevertheless failed to report to work as instructed.   (Pl. Dep., 111:18-114:6, 124:4-15, 135:1-4; Combs Dep., 88:17-21, 90:6-92:2, 92:19-93:3; Pacheco Decl., ¶ 10 and Ex. 3). It is undisputed that Plaintiff purposely waited until September 12, 2019 to call GM's automated

phone line to report he was using VR days to cover his otherwise unexcused absences on September 6, 9, 10, 11, and 12, 2019, did not call a manager during that time period, and deliberately allowed the company to wonder where he was.  (Pl. Dep., 118:2-123:12).  Finally, it is undisputed that Combs followed up on Plaintiff's attendance, and learned that he had not appeared.  (Combs Dep., 92:19-93:16).  Combs was also not aware Plaintiff had requested any VR days when she sent the termination letter.  (Combs Dep., 104:24-105:23).  And, even if she had known, Plaintiff's use of VR days would not have saved his job.  (Combs Decl., ¶ 20).

Quite simply, GM had a non-discriminatory reason for terminating Plaintiff – his failure to report to work in violation of Paragraph 64 of the National Agreement.  Even if Plaintiff tried to call GM's automated phone line several days after the fact to report he was using VR days, because GM honestly believed that Plaintiff was a no-call, no-show in violation of the National Agreement, Plaintiff's pretext claim fails as a matter of law.  *See Kariotis v. Navistar Int'l Transp. Corp*., 131 F3d 672, 680 (7th Cir. 1997) ("Discrimination statutes allow employers to discharge employees for almost any reason whatsoever (even a mistaken but honest belief) as long as the reason is not illegal discrimination.  Thus when an employee is discharged because of an employer's honest mistake, federal anti-discrimination laws offer no protection."); *Ptasznik v. St. Joseph Hosp*., 464 F.3d 691, 696 (7th Cir. 2006) ("The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise or well-considered")(internal citations omitted); *Vail v. Raybestos Prods. Co.*, 533 F.3d 904, 909 n.1 (7th Cir. 2008) (showing "honest suspicion" "does not depend on resolving the relative contractual rights of the parties, such as by interpreting the terms of the collective bargaining agreement").

Plaintiff has no evidence that comes close to creating a triable issue that GM is being dishonest with regard to the reasons for its employment decisions.  His claim therefore fails.

5.      Using the *Ortiz* Approach, No Reasonable Jury Could Conclude That
        Plaintiff Would Not Have Been Separated But For His Disability

Plaintiff also cannot avoid summary judgment using the holistic *Ortiz* approach.  As explained above, he was essentially able to game the system and work in a position for which he was not qualified, until GM caught wind of what was going on and called his bluff.  While Plaintiff may speculate that his removal from the Crib Attendant position and eventual termination were based on some sort of disability-related animus, speculation and conjecture are insufficient to defeat summary judgment; he must come forward with actual evidence of discrimination. *Hancock v. St. Joseph County*, 2011 U.S. Dist. LEXIS 73360, *19 (N.D. Ind. Jul. 6, 2011) (citing *Sybron Transition Corp. v. Security Ins. Co. of Hartford*, 107 F.3d 1250, 1255 (7th Cir. 1997) ("A party must present more than mere speculation or conjecture to defeat a summary judgment motion.")); *see also Cardoso v. Robert Bosch Corp.*, 427 F.3d 429, 433 (7th Cir. 2005) (plaintiff's bare speculation cannot constitute direct evidence of discrimination).  The only negative comments made to Plaintiff about his medical restrictions were by his co-workers, who "were bitching about [him] not driving."  (Pl. Dep., 144:18-23).  "General hostility and comments do not qualify as actionable adverse employment actions unless the hostility was severe and pervasive," and Plaintiff makes no such allegations in this case.  *See Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004).  GM attempted to keep Plaintiff employed via the ADAPT program, and by offering him a position in Die Cast North.  Plaintiff turned down ADAPT, and never reported for his second shift position in Die Cast North.  (Pl. Dep., 30:24-31:9, 57:20-58:17, 71:23-72:24, 86:1-87:4, 111:18-114:6, 118:2-123:12, 124:4-15; Beasley Dep.,   17:13-20:15; Combs Dep, 65:13-21, 88:17-21, 90:6-92:2, 92:19-93:3; Smith Decl., ¶ 11 and Ex. 2).

Plaintiff's claim fails under the *Ortiz* standard as well.

**B.      Plaintiff's Age Discrimination Claim Fails as a Matter of Law**

Plaintiff also fails to support his age discrimination claim. The analysis for age discrimination claims under the ADEA is similar to that for ADA discrimination claims. *See Everroad v. Scott Truck Sys., Inc*., 604 F.3d 471, 477 (7th Cir. 2010); *Hash*, 2020 WL 5798205, at *10-18. As such, *Ortiz* applies. *Ortiz*, 834 F.3d 760, 765. The "legal standard [in discrimination cases] is… whether the evidence would permit a reasonable factfinder to conclude that the [Plaintiff's age] caused the discharge or other adverse employment action." *Id.*

"[A] plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." *Gross*, 557 U.S. at 180 (2009). Therefore, for Plaintiff's ADEA claim to survive summary judgment, he must produce "evidence that could support a jury verdict that age was a but-for cause of the employment action at the summary judgment stage." *Fleishman v. Continental Cas. Co.*, 698 F.3d 598, 604 (7th Cir. 2012). The but-for standard adopted in *Gross*, however, does not change the familiar *McDonnell Douglas* or *Ortiz* framework used at summary judgment. To survive summary judgment under *McDonnell Douglas*, Plaintiff must show: "(1) he was over forty years of age; (2) he was meeting [GM's] legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated, substantially younger employees were treated more favorably." *Franzoni v. Hartmarx Corp*., 300 F.3d 767, 771-72 (7th Cir. 2002). If Plaintiff satisfies that burden (which he cannot), then Plaintiff must articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to Plaintiff to submit evidence that GM's explanation is pretextual. *Franzoni*, 300 F.3d at 772.

1.   <u>GM Had Legitimate, Non-Discriminatory Reasons That Are Not Suggestive of Pretext, and No Reasonable Jury Using the *Ortiz* Approach Could Conclude That Plaintiff Would Not Have Been Separated But For His Age</u>

Plaintiff has no admissible evidence that anyone in management disliked employees of a

certain age, or thought employees of a certain age were not good workers.  Plaintiff's testimony that GM was "having all the new, younger people come in" at "half pay" that are "more computer savvy than us older people" is mere speculation.  (Pl. Dep., 134:13-21).  This speculative-at-best testimony, coupled with Plaintiff's admissions that no one at GM ever said anything negative to him about his age, and that people older than him continued to work in the crib after he was terminated, demonstrates Plaintiff's utter lack of any viable age-related claim.  (Pl. Dep., 144:15-17, 150:13-16).

GM further directs the Court to sections IV(A)(2), (4), and (5) above, which sets forth the lack of evidence of any adverse action taken against Plaintiff because of any protected characteristic (including age), as well as GM's legitimate, non-discriminatory reasons for its employment decisions with respect to Plaintiff, which were wholly unrelated to his age.  These arguments apply equally to his age discrimination claim and GM incorporates them by reference.

2.    Plaintiff Fails to Identify Any Similarly-Situated Younger Employees
      Treated More Favorably

In order for Plaintiff's age discrimination claim to survive, he must identify a similarly situated, substantially younger employee who was treated more favorably.  *Franzoni*, 300 F.3d at 771-72.

Plaintiff has not identified a single substantially younger comparator at any point in this litigation. Again, to the contrary, GM has identified six Bedford employees terminated in 2018 and 2019 pursuant to Paragraph 64(d) of the National Agreement – all of whom were younger than Plaintiff, some substantially so.  Horvath is under 40.  Jordan and Morrow are under 30.  (Pacheco Decl., ¶ 17).  Addressing Plaintiff's testimony that Melissa Tincher "doesn't drive" a fork truck "because she can't see," but "has no restrictions saying not to," Tincher was indeed able to work on the fork truck when needed, and had no restriction on file with plant medical prohibiting her

from doing so.  (Pl. Dep., 108:12-20; Smith Decl., ¶ 17; Grogan Decl., ¶ 5).

Plaintiff simply cannot raise a triable issue that any substantially younger employee directly comparable to him in all material respects was treated more favorably than he was.  His age discrimination claim fails.

**C.**     **Plaintiff's Retaliation Claims Fail as a Matter of Law**

Both the ADA and the ADEA prohibit employers from retaliating against employees who exercise their rights under those statutes.  To survive summary judgment as to his retaliation claim under the ADA and/or the ADEA, Plaintiff must raise a triable issue that the alleged adverse action occurred "because" he engaged in protected activity.  *Smith v. Lafayette Bank & Trust Co.*, 674 F.3d 655, 657 (7th Cir. 2012).  Plaintiff must offer evidence to show that he engaged in protected activity, he suffered an adverse employment action, and there is a "but for" causal link between the two.  *Rowlands v. United Parcel Serv*., 901 F.3d 792, 801 (7th Cir. 2018).  Alternatively, ADA and ADEA retaliation claims can be examined using the *McDonnell Douglas* burden-shifting analysis.  *Stone v. City of Indianapolis Pub. Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002). Plaintiff's claims fail under both methods.

1.     Plaintiff Lacks Evidence That Any Adverse Action Occurred "Because"
        He Alleged in Protected Activity

Plaintiff claims he engaged in protected activity "by filing grievances and contacting the Equal Employment Opportunity Commission to protest Defendant's discrimination." (Doc. 40, at p. 2).  Plaintiff's union filed two grievances on his behalf prior to his termination, on August 20 and 24, 2019, respectively (and Plaintiff admits neither of these grievances mentioned anything about his age, or any age discrimination.  (Pl. Dep., at pp. 97:6-100:2, 139:2-10, and Ex. 9 thereto). Plaintiff filed his original Charge of Discrimination with the EEOC on October 25, 2019 – several weeks after his termination.  (Pl. Dep., at pp. 139:18-140:5, and Ex. 16 thereto).  Plaintiff does not

recall telling anyone in GM management or Human Resources/Labor Relations prior to his termination that he had contacted the EEOC, and admits he "can't prove one way or the other" whether GM knew he had consulted with the EEOC when they terminated him.  (Pl. Dep., at pp. 141:8-142:9, 150:7-12).  The retaliatory actions Plaintiff alleges he experienced were GM's "refusal to permit Plaintiff to continue working in August 2019," and his September 13, 2019 termination.  (Doc. 40, at p. 2).

It is well established that it is a "rare occasion" where suspicious timing alone will be sufficient to create a triable issue with regard to a retaliation claim. *Jones v. Alpha Rae Pers., Inc.*, 903 F. Supp. 2d 680, 687 (N.D. Ind. 2012); *see also Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) (holding that three-month gap alone could not support causality for retaliation claim; noting that "the mere fact that one event preceded another does nothing to prove that the first event caused the second.").

Here, Plaintiff has nothing to offer to attempt to raise a triable issue of causation but the fact that one event preceded another—and not even this, since GM's actions were simply a continuation of decisions already made to enforce the forklift driving requirement for crib attendants.  Plaintiff's assertion that GM's "refusal to permit [him] to continue working in August 2019" was retaliatory is undermined by the fact that GM did not, in fact, refuse to permit him to continue working – rather, management encouraged Plaintiff to participate in ADAPT, and then found a position for him in Die Cast North that met his restrictions.  (Pl. Dep., at pp. 86:1-87:4; 111:4-17, 135:1-4; Combs Dep., at p. 86:19-88:16).  Moreover, Plaintiff was never actually authorized to work in the crib in August at all in the first place – he initially did so unbeknownst to management until after the fact, and when it came to the attention of management and Human Resources, it took a bit of time for them to figure out what to do.  (Pl. Dep., 81:24-83:23; Combs

Dep., 64:14-22, 74:24-75:4, 76:16-77:12; Smith Dep., 91:15-93:24; Smith Decl., ¶ 14 and Ex. 5).

Plaintiff's assertion that GM retaliated against him for contacting the EEOC is belied by the fact that GM management and HR were not aware he had consulted with the EEOC when they terminated him.  (Pl. Dep., 139:18-140:5, 141:8-142:9, 150:7-12, and Ex. 16 thereto).

As such, Plaintiff cannot prove that retaliation was the "but-for" cause for any adverse employment action.

2. Plaintiff's Retaliation Claims Fail Under the *McDonnell Douglas* Analysis

Plaintiff's retaliation claims fail under the *McDonnell Douglas* burden shifting analysis for the same reasons his discrimination claims fail.  *See, e.g., Buntin v. City of Indianapolis*, 838 F. Supp. 2d 849, 860 (S.D. Ind. 2011).  He was not qualified to perform the essential functions of his position either with or without reasonable accommodation.  He has not identified any comparators who did not engage in protected activity and then received preferential treatment, and any attempt by him to do so at this point would be purely speculative.

GM has offered legitimate, non-retaliatory reasons for its employment decisions, and Plaintiff cannot show that those reasons are pretextual.  At best, Plaintiff's argument boils down to his disagreement with GM's decisions.  The Seventh Circuit has repeatedly held that the court "do[es] not sit as a super-personnel department that reexamines an entity's business decisions." *Fairchild v. Forma Scientific, Inc.*, 147 F.3d 567, 573 (7th Cir. 1998); *McGowan v. Deere & Co.*, 581 F.3d 575, 581 (7th Cir. 2009) ("[A] plaintiff must do more than simply allege that an employer's stated reasons are inaccurate; he must still have some circumstances to support an inference that there was improper an motivation proscribed by law.").  Plaintiff's frustration with the fact that GM would not allow him to get away with skirting his job duties anymore does not clear the "pretext" hurdle.  Plaintiff's opinion that GM should have turned a blind eye to the fact

that he no-called, no-showed for several days in a row after he was instructed to report to work is nothing more than a disagreement with GM's business decision.  This does not raise a triable issue that GM's practice under Paragraph 64 of the National Agreement was a pretext for discrimination.

To the extent Plaintiff attempts to make something out of Beasley's testimony that Smith, in an August 2019 conversation, seemed to allude to management having made a mistake by removing Barnes from the crib, the uncertain nature of Beasley's testimony (i.e., that Smith said "[s]omething along – the comment was based around, the content was sometimes you learn your lesson, or sometimes you learn to do something") underscores that Beasley's interpretation of this conversation is inadmissible speculation not supportive of any pretext.  (Beasley Dep., 86:10-87:5).

In summary, Plaintiff cannot point to any admissible evidence to show that retaliation was the "but-for" cause of GM's employment decision.  Summary judgment should be entered in GM's favor.

## V.     CONCLUSION

Plaintiff successfully circumvented the requirements of his position as a Crib Attendant for many years.  When GM no longer allowed him to get away with it, he demanded unreasonable accommodations, and now blames GM for his own decisions to turn down the reasonable accommodations that were offered, and to fail to report to his new job as instructed.  None of this allows Plaintiff to avoid summary judgment, as no reasonable juror could conclude that Plaintiff would not have been terminated if he were younger and non-disabled, or had not engaged in protected activity.  The Court should grant summary judgment in full and award GM its costs and all other appropriate relief.

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

By: */s/ Christina M. Kamelhair*
    Bonnie L. Martin (#20248-18)
    Christina M. Kamelhair (#32457-49)
    111 Monument Circle, Suite 4600
    Indianapolis, IN  46204
    Telephone:  (317) 916-1300
    Facsimile:  (317) 916-9076
    Email:  *bonnie.martin@ogletreedeakins.com*
            *christina.kamelhair@ogletreedeakins.com*

Attorneys for Defendant

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that a copy of the foregoing has been served upon the following electronically via the Court's ECF system to the following counsel on this 17th day of September, 2021.

Jeffrey A. Macey, Esq.
Barry A. Macey, Esq.
MACEY SWANSON LLP
445 North Pennsylvania Street, Suite 401
Indianapolis, IN  46204
*jmacey@maceylaw.com*
*bmacey@maceylaw.com*

__*s/ Christina M. Kamelhair*_____

Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
111 Monument Circle, Suite 4600
Indianapolis, IN  46204
Telephone:  (317)916-1300
Facsimile:  (317)916-9076
christina.kamelhair@ogletreedeakins.com

48546117.1