UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | |
|---|---|
| EMMANUEL BARNES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 4:20-cv-00087-TWP-DML |
| | ) |
| GENERAL MOTORS LLC, | ) |
| | ) |
| Defendant. | ) |

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on a Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Defendant General Motors LLC ("GM") (Filing No. 41). Plaintiff Emmanuel Barnes ("Barnes") was terminated from his employment with GM after approximately forty-one years of service. Barnes initiated this litigation alleging disability and age discrimination and retaliation claims against GM pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et. seq.*, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et. seq.* (Filing No. 1). For the following reasons, the Court **grants in part and denies in part** GM's Motion.

## I. BACKGROUND

The following facts are not necessarily objectively true, but, as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Barnes as the non-moving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Barnes began working for GM in December 1978 at the aluminum die casting plant in Bedford, Indiana. Throughout his employment at GM, Barnes worked as a production worker.

He was a member of the United Auto Workers ("UAW") union, Local 440, and the national agreement between the UAW and GM governed the terms of Barnes' employment. (Filing No. 43-1 at 4, 8; Filing No. 48-1 at 1.) Barnes--born in 1956--worked for GM for approximately forty-one years until he was terminated in September 2019 at the age of 62. (Filing No. 48-1 at 1.)

In February 2004, Barnes' position at the Bedford GM facility required him to drive a forklift. While operating a forklift in reverse, he struck a steel pole, which caused him to hit the back of his head, and the load on the forks flew back and struck him in the chest. As a result, Barnes suffered a permanent injury to his neck that substantially restricts the range of motion in his neck. (Filing No. 48-1 at 1–2.) Barnes received medical care for several months and was given several medical restrictions, including driving only in the forward direction. GM advised Barnes that there was no job available for him in the facility that he could perform, and it placed him on disability leave. In January 2005, GM recalled Barnes back to work in the position of maintenance laborer, which did not involve driving a forklift and was within his medical restriction. Four months later, on May 10, 2005, GM's plant physician, Dr. Moore, gave Barnes a permanent restriction that stated he was not to operate motorized vehicles. *Id.* at 3–4, 28–30, 32, 34.

On September 7, 2006, Barnes met with a plant doctor, the examination report states:

> CHRONIC NECK PAIN. HX INJURY CERVICOTHORCIC NECK. APPARENT RESOLUTION OF ACUTE NECK SYMPTOMS, WHICH WERE RELATED TO PRIOR WORK RESTRICTIONS. PATIENT AND I AGREE THAT THE CONDITION IS SUFFICIENTLY IMPROVED AND STABLE TO JUSTIFY REMOVING RESTRICTIONS AND RESUMPTION OF USUAL WORK ACTIVITIES, WITHOUT RESTRICTION. IT APPEARS REASONABLE TO REMOVE RESTRICTIONS. SPIROMETRY SHOWED MILD OBSTRUCION, OTHERWISE NORMAL. Plan: REVIEWED WITH PATIENT HISTORY, FINDINGS, IMPRESSIONS, PROGNOSIS, AND TREATMENT OPTIONS. CONTINUE NORMAL SURVELLIENCE SPIROMETRY. RETURN-TO-WORK, NOW, NO RESTRICTIONS NO RESTRICTION OF USE MOTORIZED VEHICLES AT WORK PLACE.

(Filing No. 43-14 at 7).

In October 2010, Barnes was bumped out of his of maintenance laborer position by a more senior employee, and the next available position for him was "driver hot metal," which required forklift driving. After refusing to report for training because of his inability to drive a forklift, Barnes received disciplinary suspensions, and the situation escalated to a point where he thought his job was in jeopardy. In a meeting about the discipline, Barnes and his UAW representative were advised that GM had no record of a medical restriction stating that Barnes could not drive a motorized vehicle. Barnes went to the plant medical department and discussed his condition with the plant physician as well as the possibility of using the seniority bid process to move to a different job. Barnes and his UAW representative retrieved the May 10, 2005 permanent restriction, written by Dr. Moore, from the medical department and brought it back to Human Resources. Barnes and the Human Resources representative discussed the possibility of Barnes using his contractual bumping rights to transfer into a "crib attendant" position, which did not involve intensive forklift driving. *Id.* at 4–5; Filing No. 48-2 at 8–9.

GM's indirect material department, commonly referred to as the "crib," houses spare parts that are used for manufacturing equipment operating in the Bedford facility. The job duties of a "crib attendant" include maintaining the supply of parts in the crib, stocking parts, performing inventory counts, manning a walk-up window in the crib, and operating a burden carrier and a fork truck (or forklift) to move and deliver parts, unload material from deliveries, and remove items from industrial shelving. (Filing No. 43-3 at 4, 7; Filing No. 43-4 at 6–7; Filing No. 43-5 at 5; Filing No. 43-12 at 6–7; Filing No. 43-2 at 11.)

Barnes began his position as a crib attendant in October 2010. In his first week working that position, he received training for forklift driving, which caused an onset of symptoms with his neck condition. Barnes went back to the plant medical department, and through further discussions

3

involving a Human Resources representative, an understanding was reached that Barnes would not drive a forklift. (Filing No. 48-1 at 5; Filing No. 48-3 at 7.) During the eight and a half years that he worked as a crib attendant, he did not have a forklift license and did not drive a forklift. Barnes was able to drive a burden carrier (which is driven in the forward direction) and did so on a regular basis without exceeding the limited range of motion he had in his neck. When Barnes transferred to second shift in the fall of 2010, he was the only crib attendant who worked that shift. He remained the only crib attendant on second shift for the next six years and never drove a forklift. (Filing No. 48-1 at 5–8.)

In 2016, Barnes was transferred to the third shift and assigned to work on the construction of a tool crib. Third shift is the overnight shift and typically started at 11:00 p.m. and ended at 7:30 a.m. Larry Butler ("Butler") was already a crib attendant on the third shift, so Barnes became the second crib attendant on third shift when he joined that shift. When the tool crib construction was completed in 2017, Barnes was assigned to work in the tool crib, and Butler was assigned to continue working in the main crib. (Filing No. 48-1 at 8, 10; Filing No. 43-1 at 5.) In addition to maintaining the tool crib and main crib, the third shift crib attendants also stocked the thirty to forty point-of-use cabinets spread throughout the Bedford facility. Barnes was responsible for more than twenty-five of these cabinets. On a typical workday, Barnes spent the first half hour of his shift in a shift change meeting with the crib attendant from the second shift. He then spent two to three hours driving around a burden carrier to restock the point-of-use cabinets. After that, he would return to the tool crib for the remainder of his shift to manage transactions with supervisors and employees who came to the crib or maintain records. (Filing No. 48-1 at 9–12.)

During the years that Barnes and Butler worked together as third shift crib attendants, Barnes did not drive the forklift. Butler did all the forklift driving, and Barnes did none. This was

an unspoken understanding between Barnes and Butler rather than an arrangement made and approved by management or human resources. (Filing No. 43-1 at 9; Filing No. 43-11 at 2–3; Filing No. 43-4 at 14, 16.)

Shortly after he was transferred to the Bedford facility in 2013, global supply chain manager Todd Smith ("Smith") learned that because of an injury in the mid-2000s, Barnes had a restriction and did not drive the forklift. (Filing No. 48-3 at 4, 7.) Smith asked a labor relations representative why Barnes did not drive a forklift and was told there was "an understanding that [Barnes] wasn't going to drive a fork truck" and that Smith should "leave it alone." *Id.* at 7.

When Barnes was working as a crib attendant during the third shift in 2019, he reported to indirect material leader Sylvia Brown ("Brown"). Although Brown generally worked the first shift, Barnes saw her on a daily basis because she generally arrived at the plant as early as 5:00 a.m., which was two and a half hours before the end of his third shift. Brown saw Barnes sporadically and tried to see each employee every day. Brown was aware that Barnes did not drive a forklift because she and Barnes had multiple conversations about the fact that he would not accept overtime work when it involved filling in for a crib attendant who was assigned to operate the forklift. At the time that Barnes worked the third shift, there were five crib attendants on first shift, two on second shift, and two on third shift. The crib had two burden carriers and only one forklift for all the crib attendants to use. (Filing No. 43-1 at 5–6; Filing No. 43-3 at 4, 9; Filing No. 48-1 at 6, 10–11.)

In 2019, Smith and Brown discussed the potential move of one of the two third shift crib attendants to the first shift.[1] Because Butler had more seniority, he was offered the choice to

---

[1] There is a dispute between the two parties regarding the reason for the move. GM alleges that it was due to an increased amount of work on first shift due to a product launch, while Barnes suggests that evidence shows that the third shift position was not eliminated.

remain on his current shift or move to the first. He chose to remain on the third shift, leaving Barnes to move to first shift. Barnes moved to first shift, but a few months later, Brown advised Barnes that his fellow hourly employees were complaining that he never drove the forklift. Barnes informed Brown that he had a restriction on file with the plant medical department which stated that he could not operate a forklift. Brown subsequently checked with the plant medical department and advised Barnes that no active restriction was in his file. Barnes later brought back a copy of a restriction dating back to 2004 or 2005 to the plant medical department. While Barnes had a restriction in 2004, the plant medical doctor lifted this previous restriction on September 7, 2006. (Filing No. 43-1 at 40; Filing No. 43-2; Filing No. 43-14 at 2; Filing No. 43-14 at 6-7.)

Because the plant medical doctor had to approve any restrictions, Barnes' department made an appointment for him for that purpose. On April 8, 2019, Barnes saw the plant medical doctor who issued a temporary restriction of "no operating power equipment" that would expire on April 6, 2020. This restriction prevented Barnes from driving either a forklift or a burden carrier. The doctor also referred Barnes to the ADAPT program. (Filing No. 43-1 at 14.)

The "Accommodating Disabled People in Transition" or "ADAPT" program was created by GM and UAW to administer workplace accommodations to employees with disabilities. The program provided the opportunity for disabled employees to be retained at work or return to work from sick leave or worker's compensation leave by being placed in jobs within their physical restrictions. ADAPT is a voluntary program and, if the employee elects to participate, the ADAPT representatives decide whether the employee can be placed into a job within his or her restrictions. (Filing No. 43-1 at 8; Filing No. 43-8 at 4, 8; Filing No. 43-9 at 4.)

In April 2019, Joyce Combs ("Combs") took over as the GM management representative for the ADAPT program in Bedford. The UAW representative for the program was Kevin Beasley

6

("Beasley"), who served in the role from 2004 to the present. Following his visit at the plant medical department, Barnes met with Beasley but not Combs. According to Barnes, Beasley told him that participating in ADAPT would return him to his previous job but remove his shift preference and not allow him overtime. Beasley also counseled that the program only lasted for 90 days. Additionally, Beasley advised that he did not believe Barnes was eligible for the program because it was "not for permanent injuries." The ADAPT program did, however, cover permanent injuries by allowing employees to be retrained or returned to work and be placed on jobs in line with the Local and National Agreements and their physical restrictions. After discussing the program with Beasley, Barnes declined to participate in the ADAPT program. Because Barnes declined to participate in the ADAPT program, he was placed on a 30-day medical leave by the plant medical doctor. He received pay during his medical leave through GM's short-term disability benefit program. (Filing No. 43-1 at 8, 14-15, 24; Filing No. 43-8 at 5, 11, 17; Filing No. 43-9 at 4; Filing No. 43-12 at 3, 8-13; Filing No. 43-13 at 3, 10-13.)

Barnes returned for a follow-up appointment with the plant doctor on May 13, 2019. The plant medical doctor issued an alternative temporary restriction of "limited driving, no driving forklift, may drive burden carrier." Barnes spoke with Beasley again without Combs present. After his conversation with Barnes, Beasley spoke with Smith. Smith told Beasley that there were "no exceptions" and forklift driving was required for any person in the crib attendant position. Smith advised Site Human Resources, including Labor Relations Director Mary Pacheco ("Pacheco"), and Brown of his concerns regarding Barnes returning to the crib attendant position because he "ha[d] been allowed to work in a position that he is not qualified to perform" due to the forklift restriction. At that time, Barnes chose to remain on medical leave. (Filing No. 43-1 at 17-18; Filing No. 43-4 at 19; Filing No. 43-8 at 15; Filing No. 43-14 at 3, 10-11; Filing No. 43-15 at 3.)

Barnes returned to the plant medical department on August 5, 2019. The plant doctor renewed his forklift operation restriction through November 4, 2019. The doctor also instructed Barnes to not turn down the ADAPT program. Barnes spoke with Beasley once again and, after speaking, went back to the plant doctor with a union representative. Barnes asked for a permanent restriction to be put in place and, on August 19, 2019, the plant medical doctor made Barnes' "no forklift driving" restriction permanent. The plant doctor also referred Banes to Human Resources/Labor Relations for job placement. Barnes reported to work in the crib that same evening and worked the entire third shift. (Filing No. 43-1 at 19-20, 24; Filing No. 43-6 at 9; Filing No. 43-14 at 12-13.)

On August 20, 2019, Brown emailed Human Resources inquiring about what she needed to do to transfer him to a new position since he could not perform the crib attendant position. Smith, who was included in the email, responded that Barnes "cannot be on an off-shift and he cannot go back to his job. If he wants to come back on ADAPT he can go work in production." Barnes and Smith met the following day and Smith advised him he should be in the ADAPT program. Barnes disagreed. Following a meeting among Barnes, Smith, a union representative, and Human Resources, Barnes was instructed to continue to report to his third shift position unless he was instructed otherwise. Barnes reported to work in the crib the next two nights but was instructed to not drive the burden carrier and to stay in the main crib with Butler. During this same time, Brown, Smith, Combs, and Pacheco met and agreed that all crib attendants were required to drive forklifts and that management would be unable to accommodate Barnes' driving restriction.

After finishing his shift on August 23, 2019, Barnes was told his position was no longer available and that he needed to contact Human Resources. In response, Barnes' union filed two grievances on his behalf on August 20, 2019, and August 24, 2019, due to his medical restrictions

and being put on sick leave and told not to report for work. (Filing No. 43-1 at 22-24, 44; Filing No. 43-4 at 22-23; Filing No. 43-9 at 6; Filing No. 43-13 at 3, 25-28.)

On September 5, 2019, Combs called Barnes and told him that GM had identified a position for him within his restrictions in Die Cast North. Barnes was instructed that he would need to report to work on second shift the following day. In response, Barnes stated that he would need to speak to his union representative as he believed, under the terms of his union's agreement with GM, he should be moved into a different position rather than the one in Die Cast North. Combs instructed him that he would still need to report to work in this new position and sent him a letter with the position and start date. Barnes received the letter but did not report to work on September 6, 2019. (Filing No. 43-1 at 28-29, 31; Filing No. 43-12 at 3, 14-15.)

When Barnes did not report to his new position, Combs contacted Pacheco regarding what she should do next. Pacheco advised her to give Barnes three days to show up and, if he did not, send him a letter pursuant to the agreement between GM and the union notifying him that he had lost his seniority. On September 12, 2019, Barnes called GM's automated telephone line to report he was using his "vacation restricted" days to cover his absences from September 6 through 12, 2019. Barnes also reported that he was not planning to return to work until October 1, 2019. Barnes alleges that he was taking vacation so the union could address his concerns with his new position, and he believed he could retroactively use vacation restricted days for his shifts from September 6 through 11, 2019. Three days after Barnes' call, the UAW went on strike. On September 26, 2019, Combs sent a letter to Barnes advising him that his seniority was broken pursuant to the agreement and that he was terminated from GM as of September 13, 2019. (Filing No. 43-1 at 29-31; Filing No. 43-9 at 19-20; Filing No. 43-12 at 3, 20-21.)

9

On August 20, 2020, Barnes filed the instant Complaint alleging GM had discriminated against him under the ADA, ADEA, and for retaliation. ([Filing No. 1](#).) After conclusion of discovery, GM filed its Motion for Summary Judgment. ([Filing No. 41](#).)

## II. **SUMMARY JUDGMENT STANDARD**

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits

of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

The Court views the designated evidence in the light most favorable to Barnes as the non-moving party and draws all reasonable inferences in his favor. *Bright v. CCA*, 2013 U.S. Dist. LEXIS 162264, at *8 (S.D. Ind. Nov. 14, 2013). "However, employment discrimination cases are extremely fact-intensive, and neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes." *Id.* at *8–9 (citation and quotation marks omitted).

## II. DISCUSSION

Barnes asserts three claims in his Complaint, Count 1: Disability Discrimination under the ADA; Count 2: Willful Age Discrimination under the ADEA; and Count 3: Retaliation. GM seeks summary judgment on all of Barnes' claims. The Court will address each claim in turn.

### A. Disability Discrimination

GM first argues that Barnes is not a "qualified individual" under the ADA. (Filing No. 42 at 18.) The ADA prohibits employers from "discriminat[ing] against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a); *see also, Equal Emp. Opportunity Comm'n v. Sears, Roebuck & Co.*, 417 F.3d 789, 796 (7th Cir. 2005). To support an ADA claim, a plaintiff must show, "(1) he is disabled within the meaning of the ADA, (2) he is qualified to perform the essential functions of his job either with or without reasonable accommodation, and (3) he suffered from an adverse employment decision because of his

disability." *Pugh v. City of Attica*, 259 F.3d 619, 626 (7th Cir. 2001). Under the ADA, a plaintiff must be a "qualified individual" under the statute at the time the adverse employment action was taken. *Bilinksky v. American Airlines, Inc.*, 928 F.3d 565, 569 (7th Cir. 2019). As outlined by 42 U.S.C. §12111(8), a "qualified individual" is "an individual who, with or without reasonable accommodations, can perform the essential functions of the employment position that such individual holds or desires."

The Seventh Circuit has held that "*all* discrimination cases present the same basic legal inquiry: At the summary-judgment stage, the proper question to ask is 'whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the [plaintiff's] discharge or other adverse employment action.'" *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499 (7th Cir. 2017) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)) (emphasis and alteration in original). In *Ortiz v. Werner Enterprises, Inc.*, the Seventh Circuit overruled a series of cases dividing discrimination claims into "direct" and "indirect" categories and assigning different legal standards to each. *See* 834 F.3d at 765 ("Evidence is evidence. Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled 'direct' or 'indirect.'"). But as a means of "organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases," courts employ the well-known burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

Under *McDonnell Douglas*, a plaintiff must first show that "(1) he is a member of a protected class; (2) he performed his job to his employer's expectations; (3) he suffered an adverse

12

employment action; and (4) one or more similarly situated individuals outside his protected class received better treatment." *Ferrill*, 860 F.3d at 500 (citation omitted). If the plaintiff demonstrates these elements, "the burden shifts to the employer to come forward with a legitimate, nondiscriminatory reason for the challenged employment action." *Id.* "If the employer does this, then the burden shifts back to the plaintiff to produce evidence establishing a genuine dispute of fact about whether the employer's reason was a pretext for discrimination." *Id.*

GM contends that it is undisputed that for most of his time working for GM, Barnes did not possess a valid medical restriction. *Id.* at 19. Additionally, any arrangement Barnes had with his fellow employees that prevented him from operating the forklift were informal and not formalized by management. *Id.* GM contends that while Barnes had been able to stay "under the radar" by avoiding driving the forklift, there is no dispute that driving the forklift was an essential function of the crib attendant position and, as Barnes could not perform this essential function, he did not meet the definition of a "qualified individual" and has no claims. *Id.* at 20.

Secondly, GM asserts that even if he were a qualified individual, Barnes has presented no evidence that his disability was the "but for" cause of his termination. *Id.* GM contends that the evidence demonstrates that GM did not remove Barnes from the crib attendant position and place him on medical leave because of his disability, but rather because his request to remain in his same position with an accommodation of not operating a forklift was unreasonable. *Id.* at 20-21. Additionally, GM argues that it attempted to accommodate Barnes with the provision of the ADAPT program, which Barnes refused to participate in. *Id.* at 21. GM also contends that when it did terminate Barnes it was not due to his disability, but rather his failure to report to work as instructed. *Id.*

Third, GM argues that whether Barnes relies on the burden-shifting framework from *McDonnell Douglas* or the holistic approach set forth in *Ortiz*, he is unable to support his claim of disability discrimination. *Id.* at 22. GM asserts that Barnes had not identified any similarly situated, non-disabled employee who was treated more favorably than him. *Id.* GM, on the other hand, has identified six non-disabled employees who were terminated in 2018 and 2019 for the same reasons as Barnes. *Id.* Additionally, GM contends that even if Barnes could make a prima facie case, it has presented the legitimate, non-discriminatory reasons for removing Barnes from his position and, once identifying a new position, terminating him: specifically, his inability to operate a forklift and his failure to show up for his new position. *Id.* GM asserts that the factual support for its decisions demonstrate that there is no evidence suggestive of pretext. *Id.* at 23-25. Even if he were to rely on the *Ortiz* approach, GM argues that evidence, including its attempts to keep Barnes employed via the ADAPT program and by offering him a position at Die Cast North, does not support a triable issue on alleged disability discrimination. *Id.* at 26.

In response, Barnes first argues that whether he is a "qualified individual" under the ADA is a disputed issue of fact as there is conflicting evidence regarding whether driving the forklift was an essential function of the crib attendant position. (Filing No. 49 at 26.) According to Barnes, the major issue in this case concerns whether driving the forklift was essential to performing his job. *Id.* Barnes contends that several pieces of evidence support his position that driving the forklift is not an essential function of the job. *Id.* These pieces of evidence include the following: (1) there is only a single forklift in the crib, but multiple crib attendants during the majority of shifts; (2) during each shift, one crib attendant is usually assigned to operate the forklift; (3) Barnes spent six years as the only crib attendant on second shift and never operated the forklift; and (4) a first shift crib attendant, Melissa Tincher, is never assigned to operate the forklift. *Id.* at 26-27.

Barnes also argues that this evidence undermines what GM describes as its current position that driving the forklift is an essential function. *Id.* at 27. Barnes contends that the only job description GM presented for the crib attendant position was dated four months after he was removed from his position. *Id.* at 28. Since the date of this job description, GM created two new job descriptions for the crib attendant that appear to divide responsibilities and require forklift responsibilities to only one of the new positions. *Id.* Barnes argues that, at the very least, this establishes an issue of fact regarding whether driving the forklift was an essential function of the position. *Id.*

Barnes also contends that GM discriminated against him by revoking his reasonable accommodation and refusing to restore it. *Id.* Barnes suggests that GM's primary argument is that it was not required to accommodate him "because driving a forklift is an essential function of the job, and accommodation does not require the elimination of an essential function." *Id.* at 29. As discussed above, he argues that whether driving the forklift was an essential function is a disputed issue of fact that should be decided by a jury. *Id.* Barnes alleges that GM also discriminated and retaliated against him when it terminated him in violation of the labor agreement and GM's usual practice. *Id.* He contends GM's usual practice was to send a letter pursuant to paragraphs 64(c) and 64(d) of the labor agreement after three days of unexcused absences notifying the employee that he or she had five days in which to report to work. *Id.* at 30. Barnes argues that the notice he received from Combs did not include the standard 64(d) language and, therefore, his seniority was not terminated. *Id.* at 31. Barnes also argues that this deviation from standard practice is evidence of pretext. *Id.* at 32.

In reply, GM contends that the evidence demonstrates that "there were significant organizational and operational changes in the Indirect Materials Group in the months leading up to Plaintiff's removal from the crib." (Filing No. 52 at 3.) GM argues that these changes provide a

context for Barnes' removal, asserting that the significant transformation occurring within the department led to the decision by management that all crib attendants needed to be able to operate a forklift. *Id.* GM argues that the ADA does not limit its ability to establish or change the content, nature, or functions of a job. *Id.* at 4 (citing *Bilinksy v. American Airlines, Inc.*, 928 F.3d 565, 571-72 (7th Cir. 2019)). And as for Barnes' termination, GM argues that whether it used the correct procedure has no bearing on whether it discriminated against Barnes. *Id.* at 5.

As Barnes stated, the main issue in this case is whether operating the forklift was an "essential function." The ADA provides that "consideration shall be given to the employer's judgment as to what functions of a job are essential." 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(n). "[T]o determine whether a particular duty is an essential function," a court considers factors like "the employee's job description, the employer's opinion, the amount of time spent performing the function, the consequences for not requiring the individual to perform the duty, and past and current work experiences." *Stern v. St. St. Anthony's Health Ctr.*, 788 F.3d 276, 285 (7th Cir. 2015) (quoting *Gratzl v. Office of the Chief Judges of the 12th, 18th, 19th & 22nd Jud. Cirs.*, 601 F.3d 674, 679 (7th Cir. 2010)); *see* 29 C.F.R. § 1630.2(n)(3).

The evidence before the Court shows a genuine issue of material fact regarding whether operating the forklift was an essential function of the job. While GM maintains that driving the forklift was essential, several pieces of evidence call this into question: Barnes' eight and half years in the position without being required to drive the forklift, Barnes being placed in the position without ever being required to possess a forklift license or undergo regular recertification, there only being one forklift worker while there are several crib attendants working the majority of shifts, testimony that Barnes' supervisor and others knew of his inability to operate a forklift including never accepting overtime for another crib attendant that regularly operated a forklift, and

16

the two September 2019 crib attendant job descriptions which require only one position to operate the forklift. These same pieces of evidence also create a dispute over whether exempting Barnes from the forklift operation requirement is a reasonable accommodation. Given the conflicting evidence at this stage of the case, genuine issues of material fact exist and summary judgment is **denied** as to Barnes' ADA discrimination claim.

**B.** **Age Discrimination**

GM also seeks summary judgment on Barnes' ADEA discrimination claim. The ADEA makes it unlawful for an employer to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age. *See* 29 U.S.C. § 623(a)(1). Like a claim under the ADA, the question before the Court at the summary judgment stage is whether the evidence would permit the jury to conclude that Barnes' age caused his removal from the crib attendant position or termination. *See Ortiz*, 834 F.3d at 765.

GM argues that Barnes has failed to provide any evidence that his age was the reason behind GM's actions. (Filing No. 42 at 27.) In response, Barnes provides a sparse and somewhat unsupported defense, void of specific reference to factual information in the record and citing to a single case. (Filing No. 49 at 35.) Barnes' limited argument is essentially that the evidence supporting his ADA claim also supports his ADEA claim. *Id.* The Court disagrees. Barnes has not identified any evidence from which a reasonable factfinder could conclude that GM discriminated against him on the basis of his age. Under either *McDonnell Douglas* or *Ortiz*, dismissal of Barnes' claim is warranted. Summary judgment on Barnes' ADEA discrimination claim is **granted**.

### C. Retaliation

Finally, GM seeks dismissal of Barnes' retaliation claim. (Filing No. 52 at 29.) To succeed on a retaliation claim under the ADA or ADEA, Barnes must produce evidence from which a reasonable jury could conclude that (1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action. *See Lauth v. Covance, Inc.*, 863 F.3d 708, 716 (7th Cir. 2017). Like Barnes' ADEA claim, GM contends that Barnes has provided no evidence demonstrating the "causal link" between his protected activity and the alleged adverse employment actions. (Filing No. 42 at 29.)

Like his defense of his ADEA claim, Barnes gives a brief and relatively unsupported defense, arguing that there is no dispute that he filed grievances prior to his termination and that GM was aware of these grievances. (Filing No. 49 at 35.) But to successfully bring his claim, Barnes is required to establish that GM's desire to retaliate was the but-for cause of the adverse employment action. *See e.g., McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 370 (7th Cir. 2019) (plaintiff bringing retaliation claim "needed to demonstrate that retaliation was the 'but-for' cause of the adverse action, 'not merely a contributing fact'"). Barnes has not met this standard. Participating in protected activity and an employer's knowledge of that activity is not enough to establish a valid retaliation claim. Summary judgment on Barnes' retaliation claim is **granted**.

### III. CONCLUSION

For the reasons discussed above, GM's Motion for Summary Judgment (Filing No. 41) is **GRANTED in part and DENIED in part**. Summary judgment is **granted** as to Barnes' age discrimination and retaliation claims. Summary judgment is **denied** as to Barnes' ADA discrimination claim and this claim shall be resolved through settlement or trial.

Accordingly, the parties shall contact the Magistrate Judge to schedule a settlement conference. The final pretrial conference and trial date will be scheduled in a separate Entry.

**SO ORDERED.**

Dated: 9/26/2022

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Jeffrey A. Macey
MACEY SWANSON LLP
jmacey@maceylaw.com

Barry A. Macey
MACEY SWANSON LLP
bmacey@maceylaw.com

Christina M. Kamelhair
OGLETREE DEAKINS NASH SMOAK & STEWART
christina.kamelhair@ogletree.com

Bonnie L. Martin
OGLETREE DEAKINS NASH SMOAK & STEWART
bonnie.martin@ogletree.com